256 N.J. Super. 575 (1992)
607 A.2d 1003
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PATRICK CARROLL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 14, 1992.
Decided May 20, 1992.
*579 Before Judges PRESSLER, SHEBELL and D'ANNUNZIO.
Wilfredo Caraballo, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, of counsel and on the brief and reply letter brief).
Robert J. Del Tufo, Attorney General, attorney for respondent (James E. Jones, Jr., Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Defendant appeals his jury conviction for the first-degree crime of murder (N.J.S.A. 2C:11-3a(1)). His motion for judgment of acquittal or, in the alternative, a new trial was denied. Defendant was sentenced to a 40-year term of imprisonment with 30 years of parole ineligibility.
In his brief on appeal defendant argues:

POINT I: THE COURT'S RESTRICTION OF DEFENDANT'S CONSULTATION WITH HIS ATTORNEY WAS A DENIAL OF HIS RIGHT TO ASSISTANCE OF COUNSEL (NOT RAISED BELOW).

POINT II: THE ADMISSION OF THE SAMPLES OF DEFENDANT'S HANDWRITING FOR COMPARISON BY THE JURY WITHOUT THE GUIDANCE OF EXPERT TESTIMONY WAS ERRONEOUS.

*580 POINT III: IT WAS ERROR FOR THE COURT TO FAIL TO EXCUSE CERTAIN JURORS FROM SERVICE ON THIS CASE.

POINT IV: THE ADMISSION OF HEARSAY EVIDENCE DURING THE TRIAL DEPRIVED THE DEFENDANT OF A FAIR TRIAL (PARTIALLY RAISED BELOW).

POINT V: THE CUSTODIAL STATEMENTS MADE BY THE DEFENDANT FOLLOWING HIS ARREST SHOULD NOT HAVE BEEN ADMITTED INTO EVIDENCE.

POINT VI: IT WAS ERROR FOR THE COURT TO FAIL TO PRECLUDE CERTAIN EVIDENCE.

POINT VII: THE FAILURE OF THE STATE TO PROVIDE FULL DISCOVERY TO THE DEFENDANT VIOLATED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL.

POINT VIII: ADMISSION OF CERTAIN TESTIMONY BY INVESTIGATOR ... VIOLATED THE DEFENDANT'S RIGHT TO REMAIN SILENT (NOT RAISED BELOW).

POINT IX: IT WAS ERROR FOR THE COURT TO PREVENT DEFENDANT FROM PRESENTING CERTAIN EVIDENCE.

POINT X: THE DEFENDANT'S MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED.

POINT XI: THE TESTIMONY OF INVESTIGATOR ... SHOULD NOT HAVE BEEN ADMITTED AS REBUTTAL EVIDENCE.

POINT XII: SENTENCE IMPOSED UPON THE DEFENDANT BY THE COURT WAS EXCESSIVE AND SHOULD BE REDUCED (NOT RAISED BELOW).

POINT XIII: THE AGGREGATE OF ERRORS DEPRIVED THE DEFENDANT OF A FAIR TRIAL (NOT RAISED BELOW).
Decedent, killed on February 14, 1985, was the supervisor of the transportation department at Harrah's Marina Hotel and Casino in Atlantic City. The State called a female witness, who had worked with decedent in Harrah's transportation department. She testified that Harrah's would farm out business to a company called Boardwalk Limo, run by Ken Melveney, defendant's cousin. When Harrah's began to get complaints that the cars were late and not clean, they gave less and less business to that company.
In January 1985, Melveney came to decedent's office about 20 feet from the witness' office. She noticed that Melveney's voice got louder and louder. She heard him say: "If you take me down, I'll take you along. I'll take you down with me." After Melveney left, decedent came out and said to her, "I can't *581 believe it. He just threatened my life." He then repeated what she had already heard.
The State called a second female who also worked in Harrah's transportation office. Because there had been a problem at the office with unauthorized people using Harrah's vehicles and a limousine driver operating with an expired license, she asked her husband, a police officer, to do a license rundown on several people, including the decedent. The rundown revealed that decedent had a long record of driving violations and was on the revoked list. The State's witness was a friend of Kenneth Melveney. She showed Melveney an abstract of decedent's record which showed his home address. When she told Melveney about decedent's driving record they tried to catch him driving and have the police stop him; however, they were unsuccessful. She also testified that there was some frustration on Melveney's part because he was not getting the business he had before. Decedent's superior testified that he received a letter from Melveney complaining about decedent and saying that Melveney was not getting as much business as he should.
Decedent's wife testified that in January 1985, a few weeks before her husband was killed, she had been at home with her husband, her children, her niece, and the niece's girlfriend when she became aware of a dark-colored Bronco driving back and forth in the street. Shortly thereafter, the doorbell rang. When she answered the door, a man asked for her husband. When he came to the door, the man said: "Hi, I'm Tony D., and I would like to talk to you about some business." He claimed he was from "Charter One" and wanted to start a limousine company in the area. When asked how he had found his address, the man said: "I don't want to go into that now. I don't want to get anybody in trouble." Decedent gave the man his work number and said they could talk there. The wife described "Tony Dee" as a very large person with a beard and sandy blond hair, dressed in a plaid shirt and blue jeans. She indicated that he was at the home for about ten minutes.
*582 On February 14, 1985, Tony Dee called the decedent's home at about 8 a.m. wanting to talk to decedent about business. Decedent's wife told him that her husband was not up yet and that he should call back. About an hour and a half later, after decedent had gone to work, the man called again. He said he was on his way to Atlantic City from Philadelphia and wanted decedent's work number because he didn't get into the area very often. She thought he said that he lived in Edgewater. Decedent was killed that day.
Decedent's wife viewed photographs including defendant's beardless photo after her husband's death but was unable to make a positive identification of Tony Dee. At trial she said that defendant could have been the man who came to her house, as he was as large as that man and his hair color and nose were the same.
Decedent's niece also was shown a photographic array. She went immediately to defendant's beardless picture and said that she believed it was the person she had seen at decedent's residence. Nonetheless, she could not say definitely that it was Tony Dee.
A transportation coordinator in the limousine department of Harrah's testified that decedent was her supervisor. Her job was to dispatch limousines and, if there were no Harrah limousines available, to call an outside vendor. On the night before the decedent disappeared, a man calling himself Tony Dee came into the office looking for her boss. He waited about an hour, but left when she told him, after her boss instructed her by phone to get rid of him, that she did not know when decedent would return. Tony Dee said he would try to contact him the next day at the office.
While Tony Dee had still been waiting, decedent pulled into the parking lot. The coordinator went to his car to say that Tony Dee was still there. Decedent drove out of the lot. He came back only after Tony Dee had left.
*583 On the next night, decedent had been in a meeting when Tony Dee called on the telephone. Decedent talked to him and then told the coordinator that he was going out to talk business. Tony Dee came to the office dressed in a leather jacket and jeans. The coordinator testified that he was "huge" and had a beard and dirty blond hair. She estimated his weight at around 260 to 270 pounds. She saw that Tony Dee was driving a black Bronco when he picked up decedent. Decedent asked the coordinator to wait for him, but he never returned. She could not definitely identify defendant at trial. Comparing defendant with the person she had seen, she said that Tony Dee appeared a lot heavier than defendant.
On February 16, 1985, a man gathering firewood off a dirt road about a quarter of a mile from the parkway in Absecon discovered decedent's body and called the local police. The body had twelve stab wounds plus additional defense wounds on the hands. The stab wounds pierced the bowel, liver, and lung and cut the main blood vessel returning blood to the heart.
On February 18, 1985, at about 6 p.m., a police officer went to the Seaview Mall in Ocean Township to meet defendant, who had reported that his car had been stolen from the parking lot. The car was a dark blue 1985 Ford Bronco. On February 24, 1985, the car was found parked on a sidewalk in New York City. It was a brand new vehicle but had used tires. The front passenger seat had been removed and someone had tried to set the inside of the car on fire. It had no license plates, the ignition had been popped out, and the radio was missing. A leather jacket was inside.
New Jersey investigators retrieved the jacket from an evidence warehouse in New York City, two-and-a-half years after it was found. It had initially been at the 43rd precinct in the Bronx before it was taken to the warehouse. A New Jersey State Police chemist tested the jacket and found that it contained a light coating of human blood on the front and sleeves. *584 Genetic markers could not be found because of the two-and-one-half year lapse of time.
The car was taken to a car dealership in Neptune, New Jersey. A Monmouth County Prosecutor's investigator went to see the car on March 27, 1985. The car had been purposely set on fire a second time, blistering the paint on a car next to it.
Defendant's brother-in-law identified a photo taken in September 1984 that showed defendant in the early stages of growing a beard. He had found pictures shortly before trial in his mother's photo album. They were allegedly taken on the occasion of defendant's wedding anniversary. A co-employee of defendant in 1984 and 1985 said that defendant was about thirty pounds heavier then. He thought defendant had had a beard at some time but wasn't sure exactly when.
A former employee of Melveney who had met defendant at lunch sometime before November 1984 thought defendant had a beard. He wasn't sure but thought defendant was not as heavy in 1984 as at the time of trial. Defendant's family doctor testified that his records showed that from 1984 to 1989 defendant had weighed around 270 to 280 pounds and there hadn't been any big swings in his weight. He only saw defendant once or twice in some years, and in 1987 he did not see him at all. He said that defendant never had a large belly.
In January 1985, a month before the murder defendant had a beard according to the testimony of his boss. He said that defendant "had a beard up until shortly after January 1989." A co-employee who had also worked with defendant at the end of 1984 said that defendant had a beard then. A thirty-year friend of defendant testified that defendant had not had a beard during the previous ten years. He said that he and his wife had gone out with defendant and his wife on defendant's anniversary in January 1985 and that defendant did not have a beard then. He also asserted that over the prior ten years defendant didn't wear flannel shirts and jeans. He later acknowledged *585 that a picture taken on February 11, 1988 showed that defendant was wearing such clothing.
Defendant's daughter testified that he had not had a beard since he had been in the communications business when she had been "little." She was now twenty years old. She identified a photo she said she had taken after her parents' anniversary in January 1985. Apparently, the picture showed her father without a beard. She acknowledged that the photo was stamped "December, '85" on the back.
Defendant's two brothers said that they had never known him to wear a beard. Two long-time friends said the same thing. However, defendant's own testimony revealed that he had had a beard sometime in the early 1980's while he was working for his brothers. He could not remember exactly when he had had a beard, but claimed that when he was working in construction he had worn a beard from about September to August each year, shaving it off for Christmas because his wife didn't want a beard in the Christmas pictures. He had told investigators that he had not had a beard in the last ten years.
Defendant identified a picture taken on his father-in-law's birthday in 1983 or possibly 1984. He also identified the anniversary photo previously referred to by his witnesses. He said it was taken following his sixteenth anniversary, but he did not say what year that was. The judge refused to admit the anniversary pictures into evidence because defendant failed to testify as to when they were taken.
The day before the jury began hearing evidence, the prosecutor told the trial judge that on the previous Friday he had discovered new information regarding a telephone call allegedly made by defendant. The prosecutor indicated that it was originally believed the call had been placed from a phone booth but it turned out that the call had been made through the switchboard of a motel in Atlantic City. Investigators went to *586 the motel and found a registration card they concluded had been signed by defendant using a fictitious name and address.
The desk clerk at the Atlantic City motel identified a signed registration card that showed that someone named Tony Dee had registered on February 14, 1985. When Tony Dee signed the register he showed his address as 131 Brown Street in Fort Lee. There is no Brown Street in Fort Lee.
The prosecutor requested that the court order defendant to submit handwriting examples to be examined by an expert. Defendant's attorney did not object, and the judge directed defendant to give the exemplars. The judge reserved on whether the State could introduce samples of signatures without expert testimony.
An assistant manager in Customer Sales and Service for New Jersey Bell reviewed a number of telephone records, including those for Melveney's home in Spring Lake Heights. They showed a collect call on February 13 from a public telephone at Harrah's to Melveney's home. On February 13, 1985, at 8:33 p.m., another collect call was made to Melveney from another public phone at Harrah's.
At 7:25 a.m. on February 14, 1985, the day decedent disappeared, a call was made from defendant's home phone to decedent's home. This was the approximate time at which decedent's wife had talked to Tony Dee. At 9:39 a.m., on that morning a call was made from Bound Brook to decedent's residence and billed to defendant's phone. It was made from the Cedar Grove Country Store, only a quarter mile from where defendant worked.
At 7:17 p.m. on that same day, a call was made from Melveney's home to the Atlantic City motel where Tony Dee had registered. At 10:07 p.m. a collect call was placed to Melveney from a pay phone at the Tropicana, and at 10:35 p.m. a collect call was placed to the home of defendant from a pay phone in Brigantine. There was also a collect call later that *587 night to Melveney from a phone booth on the Garden State Parkway in New Gretna at 12:15 a.m. on February 15.
Defendant's explanation for the telephone calls was that he carried a beeper and sometimes the wrong number was shown on the beeper as someone who wanted him to call them. He did not assert that this happened when he called the decedent's home. He said he had no idea whether he had made the call to decedent's house from a phone booth located around the corner from where he worked. He said that anybody could have made that call even though it was billed to his credit card. He said it was possible someone else used his credit card as he had given the number to his wife, his daughter, to Melveney and to other friends. However, in defendant's taped interview with the police, he had said that no one else used his card. He felt someone might have memorized his credit card number and used it to call decedent's office from the Atlantic City motel in question. He did not remember whether he had made a collect call from Brigantine to his own house on the night of the murder. He denied calling Melveney's house at 12:25 a.m. on February 15.
An investigator testified that he had a conversation with defendant at defendant's home on November 19, 1987. He asserted that defendant said that he didn't know about any problems Melveney might have had with Harrah's Casino and that he did not know anyone associated with Melveney who drove a black or dark blue Ford Bronco. Defendant told the investigator that he owned a 1985 blue and white Ford Bronco. He showed the investigator the tires defendant said had come on the car when he purchased it in November 1984. They did not match the tracks found at the scene of the crime. The parties stipulated that on October 23, 1984, defendant purchased a different car, a midnight blue 1985 Ford Bronco XLT.
Defendant told the investigator that he had worn a beard about ten years before. He was not wearing one during the interview. The jury heard the tape of defendant's statement *588 made in his home during the first interview. The investigator said defendant was 6'3", had brown hair, blue eyes, and weighed 270 pounds at the time of his arrest.
Defendant testified that when he was arrested the officers shoved a piece of green paper into his pocket and told him that "these are your rights." Defendant claimed that when they got to the Neptune Police Station he asked to call his attorney but they told him there was no time. On the way to Atlantic City they kept questioning him even though he said that his lawyer had advised him not to talk to them. They asked about his involvement with his cousin, whether he knew Tony Dee, and whether he knew his cousin had threatened the decedent. Defendant testified that the officers opened a brown paper bag, took out a jacket and asked if it looked familiar. He said, "yeah." They asked if he would be surprised if it had decedent's blood on it and he said, "at this point nothing is going to surprise me." He claimed that it was the police who tried to suggest to him that he had killed in self-defense and tried to get him to implicate his cousin.
Defendant acknowledged that he had signed a waiver of rights form at the time of the first interview but said that he did not remember signing one at the time of his arrest. He admitted that during one of his statements he was asked whether anyone associated with Melveney owned a dark blue or black Bronco and he had replied, "no." He asserted that he did not say that he owned one "[b]ecause I believe I really misunderstood the question" because he didn't think of himself as being "associated" with Melveney. In June or July 1985, defendant bought into a pizzeria that Melveney owned. He also occasionally drove one of Melveney's limos.
On the tape of the first interview, defendant had told the officers that the Bronco he purchased in 1984 was on his property. At trial he asserted: "I had the dates wrong, I'm sorry, I'm human." Four times on the tape defendant had told the police that the vehicle he was driving then was the one he *589 had been driving in January and February of 1985, and that it was the only Bronco he had ever owned.
During trial, the prosecutor told the judge out of the jury's presence that he wanted the jury to see the registration card from the motel along with samples of defendant's handwriting obtained from his employer. The judge declared that he would not allow it without expert testimony. At the conclusion of the State's case, the prosecutor asked the judge to admit a box of work orders that had been signed by defendant. He maintained that there were certain distinctive characteristics of defendant's signature that anyone could notice. The judge reviewed the specimens and said that to the untrained eye they did look similar.
Defense counsel urged that the handwriting exemplars not be admitted as he had not had the motel registration card until after the trial had started. The prosecutor explained that the phone company had originally said that one of the phone numbers being investigated was from a disconnected phone booth near the motel; but on July 27, 1989, four days before the pretrial hearing, it corrected its report and said that it was the main number of the motel. The State's investigator then contacted the owner of the motel to see whether they had any records showing that a Tony Dee had registered there. Thus, it was not until trial that the registration card was found and made available to defendant.
Defense counsel said that although he had agreed to have his client give a handwriting exemplar, the prosecutor had decided that he didn't want one. Defense counsel asserted that as a result he had stopped trying to find a handwriting expert. He objected that it would be unfair for the prosecutor to put in exemplars without expert testimony. The prosecutor claimed that N.J.S.A. 2A:82-1 permitted introduction of the exemplars even without expert testimony. After extensive argument, both on the materiality of the exemplars and on the possibility of excluding them because of prejudice to the defendant, the *590 judge ruled that the statute permitted handwriting samples to be admitted without expert testimony.
The judge then held a Rule 8 hearing to determine whether the samples obtained from defendant's employer were authentic. Defendant had written a number of documents containing a description of what he had done while employed with a telecommunications company. Defendant's co-employee had never actually seen defendant fill out the documents but he had seen him write other things. The co-employee testified that the writings looked the same and that they all looked like each other. He had no reason to think anybody else had written them. They all contained defendant's signature. Many of them required technical knowledge of the work that was done. The witness indicated that sometimes another person worked with defendant but when that happened it would show on the form.
The judge ruled that the documents were admissible. He noted defendant was responsible for filling out these forms. The judge recounted that the witness had sometimes seen defendant writing out work orders, had received the papers from defendant, and that the witness had testified that the handwriting was like handwriting he had seen defendant write. The witness then testified before the jury, identifying the writings as defendant's. He did not at that time compare the work orders with the motel registration. However, the witness later testified for the defense, saying that when he looked at the registration card from the motel he was not able to identify it as defendant's handwriting.
Defense counsel also wanted the same witness to testify as an expert in telecommunications. It was proffered that he would testify that it was easy to hook up a telephone in such a way that it looked as though a call was being made from a particular house when it wasn't. The judge refused to allow this testimony because the prosecutor had not had notice of it until a few minutes before defense counsel offered it. The *591 judge was not willing to permit an adjournment for the prosecutor to get his own expert.
A recess was taken during cross-examination of defendant. After the jury had left the courtroom, the judge said: "Mr. Carroll, you may step down and you are not to discuss your testimony with no one until your testimony is finished. With no one." Defense counsel did not object to this instruction. On cross-examination, defendant admitted that he had written certain of the work orders although he did not admit that he had written all of them. He said he did not write the motel registration card.
In rebuttal the State called a second investigator to testify that the interrogation did not occur in the way defendant had said it did. Defense counsel objected but the judge allowed the testimony. The investigator testified that before defendant was put into the car to go to Atlantic County, as well as during that ride, defendant never said that he wanted to speak to an attorney. The witness corroborated the first investigator's contention about defendant's response to the questions about the jacket. He also confirmed that defendant had said that he could enlighten the police about a lot of things about the murder and that when he said he wanted to talk to an attorney, questioning stopped.

I.
Defendant maintains that his right to effective assistance of counsel was denied when the judge told him, during an adjournment which interrupted cross-examination of him, that he was "not to discuss your testimony with no one until your testimony is finished. With no one." Plain error is urged as defense counsel did not object to this proscription.
In Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the trial judge told the defendant not to talk with his attorney about anything during an overnight recess between defendant's direct and cross-examination. Counsel *592 objected but complied. The Supreme Court held that the order violated defendant's right to the assistance of counsel and that it was not necessary to show that the error prejudiced him. 425 U.S. at 91, 96 S.Ct. at 1336, 47 L.Ed.2d at 601.
Our New Jersey Supreme Court in State v. Fusco, 93 N.J. 578, 461 A.2d 1169 (1983), followed Geders. The trial judge in Fusco told defendant that he could talk with his attorney overnight but not about his own testimony. Defendant was in the middle of cross-examination when court recessed. Id. at 582, 461 A.2d 1169. The Supreme Court refused to make the distinction that the State proposed between prohibiting a defendant from discussing everything with counsel and prohibiting a defendant from discussing his own testimony. Id. at 586-87, 461 A.2d 1169. The Court also held that prejudice need not be shown. Id. at 589-90, 461 A.2d 1169. The Court in Fusco specifically declined to "decide whether such restrictions would be reversible error if the recess were for a period shorter than overnight or if defendant had not objected to the restriction." Id. at 590, 461 A.2d 1169.
Here, the recess was for a very short period and defendant did not at any time object or request any waiver or interpretation of the restriction. Further, it is not even clear that the judge intended or that the parties understood that the instruction would prevent the defendant from consulting with his counsel.
In any event, the United States Supreme Court in Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), held that a defendant does not have a constitutional right to consult with counsel during a brief recess. Perry involved a fifteen-minute recess that occurred between direct and cross-examination. The judge told defendant that he could not speak with anyone, including his lawyer, during the break. 488 U.S. at 274, 109 S.Ct. at 596, 102 L.Ed.2d at 629-30. The Court held that although it is inappropriate to require a showing of prejudice when the assistance of counsel is denied, defendant did not *593 have a constitutional right to confer with his attorney during a fifteen-minute break. 488 U.S. at 278-80, 109 S.Ct. at 598-99, 102 L.Ed.2d at 632-34.
Defendant in this case could freely consult with counsel before he was called to testify. He would have had no right, however, to interrupt his testimony to consult with his attorney. 488 U.S. at 281, 109 S.Ct. at 600, 102 L.Ed.2d at 634. Likewise, the judge had the power to refuse any request that he declare a recess during cross-examination. We conclude that the power to maintain the status quo during a short recess should also be recognized. Thus, defendant's right to counsel would not have been violated even if the court had directed that he not discuss his testimony with counsel during the short recess. See 488 U.S. at 281-84, 109 S.Ct. at 600-602, 102 L.Ed.2d at 634-36.

II.
Defendant argues that it was error to permit the jury to compare samples of his handwriting with the signature on the motel registration without expert testimony. We hold that the judge did not err.
The judge ruled that the samples were admissible under N.J.S.A. 2A:82-1. It provides:
In all cases where the genuineness of any signature or writing is in dispute, comparison of the disputed signature or writing with any writing proved to the satisfaction of the court to be genuine shall be permitted to be made by the witnesses; and such writings and the testimony of witnesses respecting the same may be submitted to the court or jury as evidence of the genuineness or otherwise of the signature or writing in dispute; provided nevertheless that where the handwriting of any person is sought to be disproved by comparison with other writings made by him, not admissible in evidence in the cause for any other purpose, such writings before they can be compared with the signature or writing in dispute, must, if sought to be used before the court or jury by the party in whose handwriting they are, be proved to have been written before any dispute arose as to the genuineness of the signature or writing in controversy. [N.J.S.A. 2A:82-1].
Defendant first asserts that this statute prohibited use of his handwriting as it appeared on the work orders because *594 they had been written in 1988 and 1989 which was "before any dispute arose." The statute, however, establishes a prohibition against after-produced writing specimens only when the writing is offered to disprove the handwriting of any person. Here, defendant was not offering a sample of his handwriting to disprove that he signed the motel registration. Rather, the State offered his handwriting samples to prove that he did sign it. The statute does not prohibit the use of a writing made after the dispute arose in these circumstances. State v. Barris, 78 N.J.L. 14, 16, 73 A. 248 (1909).
Defendant is not claiming that the writings on the work orders should have been excluded because they were not authentic. Defendant admitted that he filled out his work orders himself, although he would not acknowledge that he had filled out all of those presented. In any event, his supervisor testified that it appeared defendant had filled them all out.
The statute says that comparison "shall be permitted to be made" by a witness, and that testimony and the writings "may be submitted" to the jury. The statute does not say that a comparison cannot be made by the fact finder without comparison testimony from a witness. No non-expert was permitted to testify that the signature on the motel receipt looked like defendant's. Unquestionably, if the State had produced an expert to testify concerning the comparison of the signatures, that testimony would have been admissible. Morrone v. Morrone, 44 N.J. Super. 305, 312, 130 A.2d 396 (1957). However, we have not been shown any New Jersey case that requires expert testimony before the fact finder may compare the signatures.
We are satisfied that defendant's writings on the work orders and the disputed signature on the motel registration were properly admitted despite the absence of expert comparison testimony. We arrive at this determination in the context of the following jury charge:

*595 In this case you have heard some evidence about and you will have available for your inspection samples of the Defendant's handwriting in the form of I believe S-80 in evidence, a folder of some work orders as he has acknowledged and you have another piece of evidence S-51, which is a registration slip at Ascot Motel. It is in sharp dispute as to whether the Defendant indeed is the person who wrote the registration at the motel and that is one of the questions that you may wish to consider in evaluating all of the evidence how important that question is entirely up to you to decide [sic]. I simply point out to you that you may, if you chose to, if you fine [sic] it credible and helpful, you may consider the documents and the testimony that you heard about the documents regarding the handwriting on the forms and on the registration certificate at the motel.
There is not, however, any evidence before you of an expert nature on that subject. You did not hear from any expert testimony, nor did you hear any other specific testimony, lay or expert, that would compare or did compare specifically and say that the signature on the card was or was not that of the Defendant. So that is a factor that you may consider in connection with all of the other evidence in deciding how important or how significant or unimportant or insignificant all of that evidence is to be.
Defendant does not cite any evidence rule that would require exclusion of this evidence. Evid.R. 56(2) allows experts to testify "as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue." That does not mean that expert testimony is always required.
The need to use expert testimony to assist the jury's understanding of other testimony normally outside the usual lay sphere is ordinarily a matter resting within the discretion of the trial judge. State v. Griffin, 120 N.J. Super. 13, 20, 293 A.2d 217 (App.Div.), certif. denied, 62 N.J. 73, 299 A.2d 71 (1972); see, Butler v. Acme Markets, Inc., 89 N.J. 270, 283, 445 A.2d 1141 (1982); Kajetzke v. New Jersey Bell, 241 N.J. Super. 193, 195-96, 574 A.2d 539 (1990).
An Annotation found at 80 A.L.R.2d 272 "discusses the question whether it is proper for a jury, or a court sitting as a trier of facts, to make a comparison of the disputed writing with a genuine standard produced in court, without the aid of an expert witness." H.C. Lind, Annotation, Propriety of jury, or court sitting as trier of facts, making a comparison of a disputed writing with a standard produced in court, without *596 the aid of an expert witness, 80 A.L.R.2d 272 (1961) (footnotes omitted). The substance of the Annotation is as follows:
At common law a general rule developed that the trier of facts could not make a comparison of handwriting, but an exception to this rule came to be almost universally recognized when a proved or admitted standard used for comparison with the disputed writing was already in evidence for other purposes. When comparison was permitted under this exception, most courts in which the question has arisen or has been mentioned have held or recognized that the trier of facts could make the comparison with or without the aid of experts or without being controlled by expert testimony if given, and some courts, in effect extending the general common-law rule, have permitted the trier of facts to make a comparison without the aid of experts even though the admitted or proved standard was not in evidence or otherwise relevant to the case.
Many jurisdictions have enacted statutes dealing with the comparison of handwriting, and these statutes are of varying kinds.
One of the more common provisions, based on the original English act, permits comparison by "witnesses" and submission of the writings and the evidence of the witnesses to the court or jury as evidence of the genuineness or otherwise of the disputed writing. Among states with this kind of statute or with a slight variation thereof permitting comparison by expert witnesses, or by experts and witnesses familiar with a person's handwriting, there has been some disagreement as to whether or not the trier of facts could make a comparison without the aid of experts.
Under another type of statute in effect in some states and permitting comparison by a "witness" or by the jury, or by "experts" or the jury, however, it has generally been held that the jury could make a comparison without, or notwithstanding, expert testimony.
Other statutes, adopted in a few states, include one permitting comparison "with or without the testimony of witnesses," and another providing for proof of handwriting "by witnesses or comparison" and "by experts, or by a comparison." In such states, it has been held that the trier of facts could make a comparison without the aid of experts or without being bound by expert testimony if given. [Id. at 274-75 (footnotes omitted)].
It was stated in Wooddell v. Hollywood Homes, Inc., 105 R.I. 280, 252 A.2d 28 (1969) that:
Testimony based on a comparison of a disputed signature with a genuine signatures [sic] produced in court is competent evidence to prove or disprove the genuineness of a signature. Expert evidence is not indispensable to prove the authenticity of a signature. [252 A.2d at 31 (footnotes omitted)].
In a criminal prosecution for aggravated forgery, the Supreme Court of Minnesota in State v. Houston, 278 Minn. 41, 153 N.W.2d 267, 269 (1967), stated:

*597 Whatever may have been the experience and competence of common-law jurors to assess the genuineness of signatures, we are of the opinion that this aptitude is one which today most laymen have been obliged to develop in conducting their own affairs. With the widespread use of credit cards and travelers' checks, merchants and others in the field of commerce are frequently confronted with the necessity of comparing signatures. In the light of this common experience and exposure, we hold that a factfinder may, in the discretion of the court, be permitted to resolve the issue of forgery without expert assistance.
Similarly, the Supreme Court of North Carolina in reversing a decision of its Court of Appeals and overruling earlier precedent held in State v. LeDuc, 306 N.C. 62, 291 S.E.2d 607 (1982) that "the fact-finder may compare a known sample of a person's handwriting with handwriting on a contested document and thereby determine whether the handwriting is the same on both without the aid of competent lay or expert testimony." Id. 291 S.E.2d at 611. The North Carolina court in making its observations of its own statute, which is similar to the New Jersey statute, said:
The statute states "a comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine, shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury." [Emphasis supplied]. The statute does not mandate that writings be submitted only with evidence of witnesses; it merely states that writings and testimony may be submitted to the trier of fact as evidence of the authenticity of a contested document. [Id. at 613].
The North Carolina court quoted with approval the holding of the Minnesota Supreme Court in State v. Houston and then added:
In short, the average juror today, through increased education and experience, is as prepared to compare handwriting as many witnesses qualified as experts in earlier cases. See, e.g., Yates v. Yates, supra, 76 N.C. 142; Tunstall v. Cobb, supra, 109 N.C. [316] 321, 14 S.E. [28] 29.
Furthermore, under present rules, common law and statutory, the jury is permitted to compare documents in evaluating and weighing the witness' testimony, both expert and lay. The jury's determination of the weight it gives such testimony, particularly when testimony conflicts, must be colored by the jury's own comparison of the various documents before it.
Finally, a number of jurisdictions, either by statute or case law, have made the decision to allow a jury to compare writings unaided by testimony. See, e.g., Parker v. State, 12 Md. App. 611, 280 A.2d 29, 30 (1971); Mitchell v. *598 Mitchell, 24 Wash.2d 701, 166 P.2d 938 (1946); Fed.R.Evid. 901(b)(3); Cal.Evid. Code § 1417 (West 1966). But see R. v. O'Sullivan, [1969] 2 All.E.R. 237 (England); Clark v. State, 114 So.2d 197 (Fla. 1959). [Id. 291 S.E.2d at 614].
Thus, there is ample authority for our holding that the jury may without the assistance of expert testimony compare a disputed signature with handwriting contained in genuine documents in those circumstances where the trial judge in his discretion is satisfied that such a comparison by the jury would have probative value. We find no abuse of discretion after a complete review of the entire record, including the motel registration card and the defendant's handwritten work reports.

III.
Defendant says that his conviction should be reversed because the State failed to provide him with discovery of the registration card and work orders allegedly containing his signatures prior to trial, thereby violating his rights to due process and a fair trial. Defendant's explanation of the State's behavior is not supported by the record. His assertion that the prosecutor must have known that the hotel registration card was important to the case but did not let defendant know that he intended to introduce it and the work orders until after the trial had begun is without substance.
As the State points out, defendant was informed that his handwriting might become an issue, and he consented to provide handwriting exemplars. The prosecutor represented to the trial judge that when he first investigated phone records he was told that a call had been made from a phone booth near an Atlantic City motel, and that only during trial was it learned that the call had been made from the motel itself. At that point, motel personnel located the registration card. Promptly after the prosecutor had that information he told defendant.
There is no reason to believe that defendant would have been able to prove he had not written the documents or signed the registration card if he had this discovery sooner. Further, *599 defendant has failed to note any newly discovered evidence or opinions in this regard. Defendant failed to specify what "different trial strategy" he would have adopted had he been aware sooner that the registration card would be used nor does defendant explain how he was prejudiced by not receiving this discovery earlier.
We find no basis to conclude that the State failed to provide defendant with discovery as soon as possible or that the judge erred in failing to exclude the evidence.

IV.
Shortly after opening statements and before testimony was taken, the judge questioned two jurors who had disclosed some connection with Harrah's and the decedent. The judge was satisfied that they were capable of fulfilling their duties in an unbiased way. Nonetheless, the judge said that he would honor either counsel's request to excuse the jurors. Defense counsel, however, specifically asserted that he took no position on seating the jurors. One of the two jurors did not sit with the jury during deliberations because he was chosen as an alternate.
Defendant says that it was error to fail to dismiss these two jurors. We find no reversible error.
A decision on the potential bias of a prospective juror is addressed to the sound discretion of the trial judge. State v. Singletary, 80 N.J. 55, 62-63, 402 A.2d 203 (1979). Ordinarily, a juror's declaration of impartiality will be accorded great weight and a judge's assessment of a juror's credibility in responding to questions will be respected. Id. at 62-64, 402 A.2d 203.
It cannot be concluded here that the judge abused his discretion. Defendant should not be heard to complain for the first time on appeal that the jurors should have been excused for cause on the court's own motion. To permit such a position by *600 the defense in these circumstances would countenance the taking of tactical advantage. A party should not be permitted to allow a juror to sit in the hope that the juror will favor its side, but then argue error if the outcome is unfavorable.

V.
Defendant in Point IV of his brief points to nine instances of alleged hearsay evidence he asserts were improperly admitted. He argues that this deprived him of a fair trial. He does not, however, cite any evidence rule that required exclusion of any of the evidence to which he refers. We have carefully reviewed each of defendant's assertions in light of the record and the applicable law. We are convinced that each of his contentions are clearly without merit. R. 2:11-3(e)(2).

VI.
Defendant testified that he was in a state of shock, was denied his request to speak to his attorney, did not receive new Miranda warnings after he was taken to Atlantic County, and was repeatedly questioned during the ride there. For these reasons he argues that the judge should have excluded the statements he was alleged to have made.
The judge found that defendant had made statements to the police after having been given his Miranda warnings and waiving them. The police officers involved disputed each of defendant's assertions. There was substantial basis for the judge to believe the police officers. We must, therefore, reject defendant's challenge to this evidence. State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964).

VII.
Defendant urges that the judge should not have admitted evidence that defendant's car had been burned when it was found in New York, that it was the object of arson at the Ford-Datsun *601 dealer in Neptune, and that there was blood on the leather jacket found in defendant's car.
Defendant first claims that this evidence was not relevant. Relevant evidence is any evidence having a tendency in reason to prove a material fact. Evid.R. 1(2). We are satisfied that each of these items of evidence was relevant. The victim had been seen leaving his office in a car like defendant's. Tony Dee had been seen twice driving a car like it. Defendant had a jacket like the one found in the car and when shown the jacket by the police did not deny it was his. The fact that someone tried to destroy the car with the jacket in it suggests that someone wanted to destroy evidence of the crime. Blood on the jacket was evidence that it was used during the murder.
Defendant contends that even if the evidence were relevant the judge should have excluded it under Evid.R. 4. He claims that the evidence was so highly prejudical that its probative value was outweighed. The only "prejudice" here was that the evidence tended to prove that defendant was linked to the murder. That was where its probative value lay. There was no reason to exclude it under Evid.R. 4.

VIII.
Defendant asserts that the State investigator's testimony that when defendant was being questioned after arrest he asked for an attorney and, therefore, questioning ceased, violated his constitutional right to remain silent. In State v. Ruscingno, 217 N.J. Super. 467, 471, 526 A.2d 251 (App.Div.), certif. denied, 108 N.J. 210, 528 A.2d 30 (1987), an investigating officer testified about certain facts with which he confronted the defendant. The prosecutor then asked what defendant did when he was confronted with those facts. The witness answered: "He refused to answer any further questions." Id. We held that the testimony was not elicited to allow an unfavorable inference that defendant was exercising his right to remain silent; rather, it was designed to show that the questioning had *602 a logical ending. Id. We cited and followed established federal law in Ruscingno. Id. at 470-71, 526 A.2d 251. Here, defendant's statement that he desired counsel was not used against him. Thus, defendant's right to remain silent was not violated.

IX.
Defendant claims it was error to exclude the proffered testimony of his former supervisor as telecommunications expert. He also alleges error in the exclusion of a photo of defendant without a beard.
Defendant sought to question the witness as to how easy it was to transfer a telephone call from one place to another. He wanted to show that a call that appeared to be made from one place might actually have been made from another. The judge did not allow the testimony because the State had not been given time to get an expert of its own. We find nothing in the record to suggest that anyone may have had reason to route calls through defendant's phone. In any event, the trial judge did not abuse his discretion in protecting the State when it did not have sufficient time to obtain an expert.
Defendant also sought to introduce evidence of a photo of himself without a beard allegedly taken around the time of his sixteenth anniversary. The trial judge concluded that there was insufficient foundation evidence to establish exactly when the photo was taken. Defendant only testified that it was taken sometime near his sixteenth anniversary, but did not specify the year.
Defendant's daughter said that she had taken the photo in 1985, but could not specify the exact date. She estimated that it was two weeks or maybe more after her parents' anniversary on January 25. Defendant sought to use the photo to prove that he did not have a beard at the time of the murder on February 14, 1985. Thus, it was not clear that it was taken before the date of the murder as under the testimony defendant's *603 anniversary may have actually been celebrated after February 14.
The judge had the discretion to exclude the photo under Evid. R. 4 because it had the potential to mislead the jury. We cannot say that he abused his discretion. The jury might well have been misled in view of the uncertainty about the date of the photo.
Further, any error was harmless. There was considerable testimony from witnesses that defendant did not have a beard. The jury was free to believe any of those witnesses. Moreover, the circumstantial evidence connecting defendant to the murder was highly persuasive. It is unlikely that if the photo had been admitted it would have led to a more favorable verdict for defendant.

X.
Defendant urges that the trial judge erred in denying his motion for judgment of acquittal or alternatively for a new trial on the ground that the verdict was against the weight of the evidence. The judge was required to grant the motion for acquittal only if the evidence was insufficient to warrant a conviction. R. 3:18-1. Although the evidence here was circumstantial, it was strong, persuasive, and clearly more than enough for the jury to conclude that defendant had committed the murder.
Similarly, the denial of a new trial will not be reversed unless it appears that there was a miscarriage of justice under the law. R. 2:10-1. We find no miscarriage of justice. In addition, the trial judge's ability to evaluate the intangibles of the case lends support to his conclusion that the jury's verdict was supported by the evidence.

XI.
An investigator testified during the State's case in chief about defendant's arrest and conversations with the police. *604 Defendant then testified that he had asked for an attorney but his request was denied, and he testified as to his claimed responses to questions asked by the police.
In rebuttal, the State called a another investigator who testified that he saw defendant sign the waiver form, that defendant did not request an attorney, and that defendant gave the responses to which the first investigator had testified, not those defendant claimed. Defendant maintains it was error to allow this rebuttal testimony.
Defendant cites State v. Provoid, 110 N.J. Super. 547, 557, 266 A.2d 307 (App.Div. 1970), for the proposition that rebuttal testimony is confined to contradicting specific subjects introduced in the testimony of defense witnesses. Provoid also states: "However, if the evidence would properly have been admissible in chief, the trial judge is vested with broad discretion, and the appellate tribunal will not disturb the lower court's determination in the absence of gross abuse." Id.
The investigator on rebuttal was responding to specific subjects in defendant's testimony. We find no abuse of discretion in the trial judge permitting this testimony.

XII.
Defendant was sentenced to a forty-year term with thirty years of parole ineligibility. The State had asked for a life sentence. The judge first found that the sole aggregating factor was the need to deter defendant and others. He found no mitigating factors. Defendant contends that the sentencing judge gave a reason for his sentence that does not fall within the statutory factors and that the judge ignored mitigating factors.
The sentencing judge considered the defendant's age, when he would be eligible for parole, the fact that he had no meaningful prior record, and his background, including his military service. The judge then said he considered that it was likely that defendant would be given parole after thirty years if that *605 was the maximum term he imposed. He felt it would be appropriate to impose a longer term. He also thought it would provide some incentive for defendant to conduct himself in a way that he had reason to be parole-eligible. Therefore, he imposed a forty-year maximum term.
The trial judge's sentence should be upheld if it is based on findings grounded in competent, reasonably credible evidence, if the judge correctly applied legal principles, and there is not such a clear error of judgment that it shocks the judicial conscience. State v. Roth, 95 N.J. 334, 364-65, 471 A.2d 370 (1984). We are satisfied that the sentencing judge's findings are supported by the record, that the sentence imposed was not unreasonable and does not shock the judicial conscience, and that the judge did not abuse his sentencing discretion. The judge's remarks regarding the imposition of a forty-year maximum term and its benefit regarding defendant's conduct in prison was, when viewed in context, merely incidental to the judge's sentencing rationale and does not detract from the soundness of his decision.
Defendant's contention that cumulative errors require reversal under State v. Orecchio, 16 N.J. 125, 129, 106 A.2d 541 (1954) is clearly without merit.
Defendant's conviction and sentence are affirmed.
PRESSLER, P.J.A.D., concurring.
Although I am in agreement with the majority's disposition of this appeal, I write separately to express my somewhat disparate view of the issue of effective assistance of counsel (at 591-593, 607 A.2d at 1011-1012).
Review of the record satisfies me, as it did the majority, that the judge's admonition to defendant not to discuss his testimony during the recess does not seem to have been understood by either defendant or his attorney as barring communication between them. The judge's admonition to defendant was in the same form as the admonition to all other witnesses. No objection *606 to the admonition was made by either defendant or his attorney, no request for any clarification was made, and no reference to this instruction appears at any time thereafter in the trial proceedings. Nor is there anything else to suggest that defendant and his attorney regarded themselves barred from communication or whether they in fact did communicate during the recess.
Since there is thus nothing in this record to indicate that defendant was in fact deprived of an opportunity to consult with counsel, I would not reach the question decided by the majority, namely, whether the New Jersey Supreme Court would follow the United States Supreme Court decision in Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), which modifies Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), and holds that while a defendant cannot be barred from speaking to his attorneys during an overnight recess, he can, without constitutional violation, be barred from consulting with his attorney during a 15-minute recess.
I would be loathe to quantify the right to consult with counsel on the basis of the length of the recess, and I see nothing in the New Jersey Supreme Court's opinion in State v. Fusco, 93 N.J. 578, 461 A.2d 1169 (1983), following Geders, that suggests the appropriateness, in constitutional terms, of such a quantification. In any event, that issue need not be here addressed and I would not have addressed it.