686 A.2d 1193

SHARON DAY AND RICHARD DAY, PLAINTIFFS–APPELLANTS,
v. RONALD B. LORENC, M.D., DEFENDANT–RESPONDENT,
AND BRIDGETON HOSPITAL, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 9, 1996—Decided November 12, 1996.

Before Judges LONG, SKILLMAN and CUFF.

*Frederick E. Popovitch* argued the cause for appellant (*Popovitch and Popovitch,* attorneys; *Mr. Popovitch,* on the brief; *Harmon H. Lookhoff,* of counsel and on the brief).

*Robert E. Paarz* argued the cause for respondent (*Paarz, Master & Koernig,* attorneys; *Mr. Paarz,* on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

Plaintiff, Sharon Day, appeals from a judgment entered on a jury verdict of no cause for action in the malpractice case she brought against defendant, Ronald B. Lorenc, M.D., arising out of surgery he performed to correct her deviated septum.[1]

The case arose in 1988, when plaintiff filed a malpractice complaint against defendant alleging that his deviation from the appropriate medical standard caused her to lose her sense of smell. Defendant answered, denying the material elements of the complaint and discovery ensued. A trial was held in July, 1992. Four witnesses appeared: plaintiff, defendant and an expert for each. The jury returned a verdict of no cause for action which

---

[1] Her husband Richard sued per quod.

was vacated because of a trial error. In June, 1994, the case was retried.

The same four witnesses appeared at the second trial. Plaintiff's expert, Dr. John W. Grigg, explained that during the deviated septum surgery, defendant disrupted the nasal septal lining which, in turn, caused scar tissue to form. This disruption, in and of itself, was not evidence of any negligence; even the most skilled surgeons cannot always prevent scar tissue from forming. However, in Dr. Grigg's opinion, defendant's subsequent decision to out-fracture plaintiff's middle turbinates (in order to enlarge her airway) was a deviation from the standard of care in that the middle turbinates are so close in proximity to the septal lining that a bridge of scar tissue was able to form between them. Dr. Grigg opined that it was this bridge of scar tissue which caused plaintiff to lose her sense of smell.

Defendant's expert, Dr. Frank I. Marlowe, testified that a loss of smell can only be caused by destroying nerve endings; that the nerve endings for the sense of smell do not extend below the superior, or upper third of the turbinates; and that according to defendant's surgical notes, defendant did not go anywhere near the area where the nerve endings are located, only going as high as the middle third of the turbinates. Dr. Marlowe noted that scarring does not mean the procedure was done incorrectly and that nasal polyps often cause a loss of smell. He also pointed out that the report of a subsequent treating physician, Dr. Donald P. Shapiro, indicated that he observed multiple polyps within three months of the surgery in question. Dr. Marlowe concluded that the surgery and overall treatment rendered by defendant met the standard of care.

The second jury determined that defendant had not deviated from the accepted standard of care. Plaintiff filed a motion for a new trial which was denied. She appeals, contending that the following errors warrant reversal: (1) the trial judge should have granted a mistrial when plaintiff's lawyer was unable to complete

the trial [2]; (2) the trial judge should not have allowed Dr. Shapiro's report into evidence; and (3) the trial judge improperly intruded into the case by cross-examining Dr. Grigg. We have carefully reviewed this record in light of these contentions and have concluded that a reversal is in order based on the admission of Dr. Shapiro's report into evidence.

Dr. Grigg wrote a report dated April 6, 1988 in which he concluded that defendant had been negligent. The report lists the materials he "studied" in formulating his opinion, including a letter from Dr. Shapiro to plaintiff's counsel. Shapiro had treated plaintiff for nasal polyps and performed some additional surgery on her subsequent to her surgery by defendant. Apparently, plaintiff's counsel had asked Dr. Shapiro to relate the details of plaintiff's condition and course of treatment. Shapiro sent him a two-page, single-spaced letter dated December 22, 1987. With the exception of the last paragraph, the letter essentially recounts Dr. Shapiro's treatment of plaintiff. The last paragraph of the report states:

> Although there appears to be a relationship in time between the onset of Mrs. Day's anosmia [i.e., her loss of smell] and her nasal septal surgery on May 19, 1986, I could find no direct evidence of this. Scarring, or synechia, forming intranasally following nasal surgery is quite common. Usually this might lead to some breathing problems post-operatively, but to my knowledge I have never seen this cause a loss of smell. On the other hand, nasal polyposis quite often causes a loss of smell. Furthermore, loss of smell secondary to nasal polyposis may often persist even after adequate medical and/or surgical treatment.

At trial, defense counsel succeeded in obtaining from Dr. Grigg the acknowledgement that he had relied on Dr. Shapiro's report:

> Q: No. You said that the polyps—well, we'll get to that in a second. At the beginning of your testimony, doctor, you referred to your report, in fact I think you were handed a copy by counsel, and you read from that report what documents you reviewed and *relied upon* to render your opinion, true?

---

[2] Halfway through the trial, plaintiff's counsel suffered a back injury and was unable to continue. The judge asked plaintiff's prior counsel who had been present throughout both trials and who had been referred to as "co-counsel," to continue in his stead. Plaintiff protested and moved for a mistrial which motion was denied. The trial proceeded to verdict.

A: That is correct.

Q: And one of the things that you referred to on page 2—do you have a copy of the report in front of you?

A: Of the report?

Q: Yes.

A: Yes, I do.

Q: The April 6, 1988 report.

A: Yes.

Q: On page 2, item F, letter from Donald P. Shapiro to Joseph Ruth, Esquire, dated 12/22/87, do you recall reading that and *relying upon it* and rendering your opinion?

A: On page 2?

Q: Yes, item F.

A: I don't have my—oh, I'm sorry. Item F, yes, letter from Dr. Shapiro to Joseph Ruth.

Q: That was December 22, 1987?

A: Yes.

Q: That's one of the items that you *relied upon as part of the totality of the facts* that you considered in rendering your opinion?

A: *That is one of the items that I relied upon, yes.* (emphases added).

Over plaintiff's objection, defendant offered Dr. Shapiro's report into evidence based on the fact that Dr. Grigg testified that he "relied" upon it. The trial judge admitted the letter into evidence. At the argument on the motion for a new trial, defense counsel reiterated his earlier argument:

This issue about Dr. Shapiro's report is a red herring. Their expert said he relied upon it and that's why it went in, because he said he relied upon it, and yeah, he relied upon it[,] it was something the jury had the right to consider, so it's not something that should make a difference in the outcome of this case.

The judge stated:

[O]nce your expert had testified—assuming that it shouldn't have gone into evidence, Mr. Neef, and I don't think that it should not have, but assuming it should not have, once your expert relied upon that opinion in the formation of his opinion what's the harm? This is the plaintiff's expert that's saying this opinion is right; I rely on it.

■ In his brief, defendant posited Evidence Rules 703 and 803(c)(6) as the basis for admission of the report. We dispense first with *N.J.R.E.* 803(c)(6), which provides:

Records of regularly conducted activity. A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or

diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

By its very terms, this rule is inapplicable to Dr. Shapiro's report because it was neither made "at or near the time" of the events recorded nor "in the regular course of business." On the contrary, it was a recitation prepared at the behest of plaintiff's counsel for the purpose of this litigation.

■ *N.J.R.E.* 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

While hearsay, Dr. Shapiro's report was of a type reasonably relied upon by medical experts. Thus it was proper for Dr. Grigg to consider the report in reaching his opinion, as well as proper for him to refer to it at trial. Moreover, *N.J.R.E.* 705 permitted defense counsel to cross-examine Dr. Grigg as to the bases of his opinion. However, neither of these rules provides a basis for the admission of Dr. Shapiro's report into evidence in the absence of an independent basis for admissibility.

The trial judge appears to have relied on the hearsay exception contained in *N.J.R.E.* 803(b)(2) and (3):

[803](b) Statement by party-opponent. A statement offered against a party which is:

. . . .

(2) a statement whose content the party has adopted by word or conduct or in whose truth the party has manifested belief, or

(3) a statement by a person authorized by the party to make a statement concerning the subject. . . .

Under this rule, if plaintiff had adopted Dr. Shapiro's report or authorized him to make a statement about the case, she would have been bound by these statements, and they would have properly been admitted into evidence against her.

The problem with invoking this rule is that it is plain that plaintiff, through Dr. Grigg, not only did not adopt Dr. Shapiro's unsolicited opinion but, in fact, necessarily rejected it, as evidenced by the fact that Dr. Shapiro's statement directly contravened Dr. Grigg's testimony. During cross-examination of Dr. Grigg, defense counsel did not distinguish between reliance on the facts asserted by Dr. Shapiro and agreement with the unsolicited opinion of Dr. Shapiro. This was essentially a trap which enabled the defense to suggest improperly that Dr. Shapiro's report had been adopted by plaintiff.

■ At oral argument on this appeal, defense counsel conceded, for the first time, that Dr. Shapiro's report was, in fact, inadmissible. Instead, he argued that its admission was harmless because the challenged portion of the report is relevant only to causation, an issue the jury never reached after answering the question of whether defendant deviated from the standard of care in the negative. To be sure, the final paragraph of Dr. Shapiro's report can be read, as defense counsel urges, as a comment on causation, i.e., that it is unlikely that plaintiff lost her sense of smell as a result of the septal surgery but probably lost it from the polyp surgery. However, it is susceptible to other readings as well. For example, the first and third sentences can be viewed as expressions of doubt as to plaintiff's claim of when she lost her sense of smell. The second sentence can be viewed as a statement supporting Dr. Marlowe's opinion of defendant's adherence to the standard of care insofar as Dr. Shapiro suggests that scarring is a "common" result of nasal surgery. That sentence can also be read to implicitly reject Dr. Grigg's opinion that defendant deviated from the standard of care by out-fracturing plaintiff's middle turbinates insofar as his action "allowed" a scar tissue bridge to form. It is possible that the jury simply identified Dr. Shapiro's report as supporting that of Dr. Marlowe without distinguishing between the issues of deviation and causation. It is also possible that the jury parsed out the paragraph, as the defense suggests, and disregarded it because it never reached the issue of causation.

However, we cannot be sure that this was the case and therefore the admission of this evidence was not harmless.

As in most malpractice cases, this case boiled down to a pitched battle between plaintiff's expert and defendant's expert. Anything which could have tipped the scales, ever so slightly, in favor of one or the other had the capacity to change the outcome. We simply cannot know whether the jury was swayed by the fact that defendant effectively had two experts on his "side" while plaintiff had only one, or by the fact that one of plaintiff's "own" treating doctors did not agree with her or her expert. Because we believe that this state of affairs had the capacity to produce an unjust result, we reverse and remand the case for a new trial. Our ruling renders moot plaintiff's remaining claims of error.

Reversed and remanded.