860 A.2d 1003 (2004)
373 N.J. Super. 154
Joseph RODD, Administrator Ad Prosequendum of the Estate of Maria Rodd, and Joseph Rodd, Individually, Plaintiffs-Respondents,
v.
RARITAN RADIOLOGIC ASSOCIATES, P.A., Stuart Kotler, M.D., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Submitted October 5, 2004.
Decided November 24, 2004.
*1005 Greenberg, Dauber, Epstein & Tucker, Newark, for appellants (Melvin Greenberg and Sumeeta A. Gawande, on the brief).
Eichen Levinson, Edison, for respondents (William D. Levinson, on the brief).
Before Judges SKILLMAN, PARRILLO and GRALL.
The opinion of the court was delivered by
PARRILLO, J.A.D.
In this medical malpractice wrongful death action, defendants, Stuart Kotler, M.D., and Raritan Radiologic Associates, P.A., appeal from entry of judgment, after a jury verdict in favor of plaintiff, Joseph Rodd, individually and as administrator ad prosequendum of the Estate of Maria Rodd, in the amount of $3,240,000, and from denial of their motion for a new trial. For the following reasons, we reverse and remand for a new trial.
The material facts in this matter are as follows. Decedent, Maria Rodd, had a history of severe diffuse bilateral fibrocystic disease, a condition which results in dense breast tissue that appears white in a mammogram, although it is not cancerous. She also underwent operations for cyst aspirations in both breasts, bilateral needle biopsies, and an incisional biopsy, which resulted in scarring. She began having mammography screenings to detect breast cancer early, beginning at some point in 1979 at the age of 30.
Mammography screenings are x-rays of the breast that are taken from two directions  the vertical cranial caudal direction and the horizontal medial lateral oblique direction  in order to detect cancer. To study a mammogram, a radiologist places it in a view box and analyzes it with his naked eye and a hand-held magnifying glass.
The density of the structures between the x-ray beam create an image on the film. Fatty tissue appears grayish black, and calcifications, which are non-cancerous deposits of the mineral calcium, and breast cancer appear white. Clusters of calcifications that are smaller than a millimeter are referred to as micro-calcifications and are indicators of possible malignancies. Radiologists consider both the vertical cranial caudal x-ray and the horizontal medial lateral oblique x-ray to determine whether micro-calcification clusters exist. Two views are necessary because while the view from one direction may indicate a cluster, when viewed from the other direction, the cluster may reveal itself to be calcifications existing on different levels that are not grouped together. The radiologist must examine the shape and edges of the calcifications; round or oval calcifications are generally benign, while clusters of calcifications with ill-defined margins and bizarre shapes may indicate cancer. Radiologists also compare the x-rays of each breast with the other, to determine whether the calcifications correspond with each other, or are significantly different. In order to assess whether changes have occurred in the breast tissue, radiologists compare available films from prior years with the film they are evaluating to see if there is a change in the area of density or increased calcifications.
A grouping of six or more abnormally shaped calcifications in a volume of one to two cubic centimeters is considered a cluster that raises suspicion of malignancy. However, a radiologist also considers whether the calcifications are "focal" or "diffused." Suspicion is raised if the calcification is focal rather than diffused. The calcifications are focal if they are seen "in only one relatively small part of the breast." On the other hand, diffused calcifications *1006 are considered a "general phenomenon" if they occur throughout a patient's breast, and they do not indicate malignancy. Ultimately, the radiologist looks to see if "one part of one of the two breasts ... is obviously different from the remainder of that breast and the opposite breast."
Indisputably, decedent's mammograms were negative for cancer through 1995. Defendant Kotler (defendant), a radiologist with a sub-specialty in mammography, interpreted decedent's mammography films on August 11, 1997 and August 11, 1998, using a hand-held 2.5 power magnifying glass that magnified the image by four times, which was the recognized diagnostic tool at the time. Defendant reported that the calcifications appearing in the 1997 and 1998 x-rays were not indicative of cancer, and he recommended a one-year follow-up. Specifically, defendant found that the calcifications in decedent's 1997 mammogram films were fairly widely distributed throughout her breasts and that no one area of calcifications appeared more suspicious than another area within both her breasts. He found that there was not a solitary cluster of calcifications that stood out more strongly against the rest of the calcifications diffused through her breasts. No one part of one breast appeared obviously different from the remainder of that breast or the opposite breast. He also found that the calcifications in the 1997 films were generally unchanged from those in the 1996 films. The calcifications in decedent's 1998 mammogram films were also fairly widely distributed through both breasts, due to her diffuse bilateral fibrocystic disease, and they were unchanged since the 1997 mammogram.
Decedent discovered a lump in her breast in early 1999. She was diagnosed with infiltrative intraductal carcinoma by biopsy on January 9, 1999. She died on August 30, 2002, after unsuccessful treatment. This medical malpractice complaint was filed on September 14, 2000, and amended to include a count for wrongful death on November 12, 2002.
For use at trial, plaintiff digitally scanned select portions of the 1997 and 1998 mammograms into a computer to produce super-magnified images, which were then projected onto a six-foot by eight-foot screen for the jury to view. This demonstration was purportedly offered to aid the jury in explaining the nature of the appearance of a malignancy in a mammogram, but was used, in effect, to simulate for the jury what defendant actually saw when he viewed the films using the magnifying lens, namely, clustered micro-calcifications in decedent's left breast indicative of cancer. In fact, plaintiff's expert, Dr. Berg, testified that viewing the computerized images on the large screen from the perspective of the jury was similar to a radiologist viewing a mammogram film on a light box from close observation using a four-times magnifying glass. Nevertheless, these digitalized, computerized images were selectively composed by plaintiff's counsel and magnified by anywhere between thirty and 150 times the size of the x-rays. For example, one image of a 1996 x-ray was blown up so that a distance of 1.5 centimeters on the mammogram was represented on the screen to be fifteen to sixteen inches  a magnification of more than thirty times.
Defendant objected to the use of these super-magnified computer images. In the first place, defendant had not received notice in discovery and only first learned of their existence at a pre-trial conference, too late to adequately test the process by which the images were created. Further, the trial judge rejected defendant's requests that plaintiff's computer operator and all of the computer images created *1007 from the x-rays, even those rejected by plaintiff, be made available to the defense. In fact, only a log or printout of selected images were made available to defendant, and not until midway through the trial.
Most significantly, defendant objected because of the potential for distortion and confusion engendered by use of the super-magnified images. On this score, defendant's expert, Dr. Becker, testified that "[t]his is such an artificial situation," and that "[n]ever having viewed a mammogram at this degree of magnification, I'm having difficulty telling what's a calcification and what is breast tissue." Dr. Becker observed that, in presenting the images, plaintiff "subtracted the ruler so I can't say whether they're micro-calcifications," and that "there are multiple other areas that [plaintiff had] chosen not to box that show white dots, calcifications in groupings."
Defendant himself testified that the great magnification blurred calcifications that were actually sharp images, and indicated that if the computer images were accurate, x-ray films would not be used by radiologists. He expressed concern that plaintiff may have created the appearance of the cluster by compressing the image, and further, may have created the appearance that the cluster was focal, rather than part of a general phenomenon of numerous diffuse calcifications, by showing only a selective cluster rather than an all-inclusive picture of the calcifications. Even plaintiff's expert, Dr. Berg, stated that he examines mammograms with a hand-held magnifying glass and that he does not project mammograms to the size used in court. On cross-examination, Dr. Berg at first testified that a dot on the screen could possibly represent a calcification, but then acknowledged that the dot might actually be a dust particle, and therefore, he could not be sure if a particle was a calcification because of the "grain on the film when you magnify it."
Despite these objections, the trial judge allowed the use of the large screen computer projections, explaining that such demonstrative evidence would aid the jury. Yet, the judge never gave an instruction limiting the use of such evidence for this narrow purpose. Instead, plaintiff's counsel used the computer imagery extensively throughout trial to suggest to the jury that because the cluster was so clear in the blown-up computer images, it was equally clear when viewing the mammogram films under a hand-held magnifying glass.
For example, in his opening statement, plaintiff's counsel projected a cluster of irregularly shaped micro-calcifications, blown up on the screen and circled in red, and told the jury that it was a suspicious cluster of micro-calcifications that appeared on decedent's 1997 mammogram, but that Dr. Kotler did not report it even though "it was cancer, clear as a bell." Likewise, during direct examination of his expert, plaintiff's counsel used the computer imagery to "zoom in" and demonstrate that the 1997 mammogram of decedent's left breast had a cluster of more than a dozen calcifications within one cubic centimeter area. Plaintiff's counsel had the computer operator magnify a purported calcification cluster viewed on the computer images of the medial lateral oblique (MLO) view, and then, after confirming that it was "the standard of care to look at the other view," counsel had the operator bring the cranial caudal (CC) view into focus, to make it "brighter" and to increase the magnification. Counsel used the same technique with the 1998 film, prompting Dr. Berg to remark on the improved ease for viewing calcifications with the computerized magnification: "It's actually easier to see. The projection is a little bit different, and they always are a *1008 little different. But you can see without any difficulty at this magnification a whole slew of tiny calcifications in a cluster up in this part of the breast. . . ."
Plaintiff also relied heavily on the computer projections in counsel's cross-examination of defendant's expert, challenging Dr. Becker's testimony that decedent's breast contained so many calcifications that the horizontal and vertical x-ray views did not indicate whether the group of calcifications visible in one breast corresponded with the other, and that the different angles which the two views produced indicated that the calcifications visible in one x-ray were not, in fact, clusters. And in summation, plaintiff's counsel again emphasized that the suspicious calcification cluster shown in the computer image was "clear as day" and that it was "the standard of care" for defendant to see that cluster regardless of the cysts and other densities in decedent's breasts:
But with the densities, with some cysts, with the fact that there was some calcifications elsewhere, none of that obscured what you'll see here as clear as day and what you see on the opposite view.
. . . .
Why did Dr. Kotler miss it?
After deliberations, the jury returned a verdict awarding plaintiff $1.5 million for loss of consortium; $1.7 million in survivorship damages; and $40,000 for wrongful death. Defendant moved for a new trial on the ground, among others, that the computer magnification of the mammograms was unfair. The judge denied the motion, reasoning in part that the jury is disadvantaged in radiology cases because, while radiologists with fifteen to twenty years of experience are able to interpret small x-rays, the jury has no prior experience. He, therefore, concluded that allowing plaintiff to super-magnify an image helps to reduce the handicap jurors are operating under in medical malpractice cases. The judge compared blowing up the mammogram to blowing up an intersection of a highway, and concluded that it only acted to bring the jury up to speed with what a radiologist interprets. He went on to say that "the message may get  get out now, that in radiology, and I know the radiologist is under awesome pressure reading these films, that maybe they ought to blow it up like that." The judge continued by asserting that "maybe the whole industry is negligent. Maybe in this case, something ought to be done ... maybe this message is gonna get out .... it seems, to me, to be very simple and very easy to implement, in a radiology group, blowing it up on a screen."
Defendants raise the following issues on appeal:
I. THE TRIAL COURT ERRED IN PERMITTING THE ADMISSION OF SUPER-MAGNIFIED COMPUTER IMAGES OF MAMMOGRAMS WHICH WERE IRRELEVANT TO THE STANDARD OF CARE APPLICABLE TO DR. KOTLER.
A. The Computerized Images Were Irrelevant to Whether Dr. Kotler Adhered to the Standard of Care
B. The Prejudice Caused by the Computer Images Substantially Outweighed Any Probative Value
C. The Failure to Disclose the Evidence Before Trial Prohibited Its Use
II. THE TRIAL COURT ERRED IN FAILING TO DECLARE MISTRIAL OR GIVE A CURATIVE INSTRUCTION WHEN ONLY FOUR JURORS VIEWED EVIDENCE THAT WAS DESTROYED.

*1009 A. The Trial Court Erred in Failing to Give a Curative Instruction
B. Dr. Kotler Was Denied His Right to An Eight-Person Jury
III. THE TRIAL COURT ERRED IN FAILING TO GIVE A JURY CHARGE REGARDING MEDICAL JUDGMENT.
IV. THE TRIAL COURT ERRED IN FAILING TO GIVE A CURATIVE INSTRUCTION REGARDING RODD'S COUNSEL'S IMPROPER STATEMENTS.
V. THE LOSS OF CONSORTIUM AWARD WAS GROSSLY EXCESSIVE.
We first address defendants' principal contention that the computer imagery displayed to the jury was unduly prejudicial, warranting a new trial.
"There is nothing inherently improper in the use of demonstrative or illustrative evidence." State v. Scherzer, 301 N.J.Super. 363, 434, 694 A.2d 196, 230 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997); see State v. Feaster, 156 N.J. 1, 82, 716 A.2d 395, 435-36 (1998); State v. Raso, 321 N.J.Super. 5, 19, 728 A.2d 231, 239 (App.Div.), certif. denied, 161 N.J. 332, 736 A.2d 525 (1999). Demonstrative or illustrative evidence may be evidence that replicates the actual physical evidence, State v. Scherzer, supra, 301 N.J.Super. at 434, 694 A.2d at 230, or demonstrates some matter material to the case, State v. Gear, 115 N.J.Super. 151, 153-54, 278 A.2d 511, 512 (App.Div.), certif. denied, 59 N.J. 270, 281 A.2d 532 (1971), or illustrates certain aspects of an expert's opinion. State v. Raso, supra, 321 N.J.Super. at 19, 728 A.2d at 239. It is in the nature of a visual aid  "a model, diagram or chart used by a witness to illustrate his or her testimony and facilitate jury understanding." Macaluso v. Pleskin, 329 N.J.Super. 346, 350, 747 A.2d at 833 (App. Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000).
In general, the trial court enjoys wide latitude in admitting or rejecting such replicas, illustrations and demonstrations and in controlling the manner of presentation and whether or not particular items are merely exhibited in court or actually received in evidence. See, e.g., State v. Scherzer, supra, 301 N.J.Super. at 434-45, 694 A.2d at 230-31; State v. Feaster, supra, 156 N.J. at 82, 716 A.2d at 435-36; Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 611 (2004). That is, the trial court controls not only the admission of this type of evidence, but also the form and limits of its presentation, as well. Although discretionary, the admissibility of such evidence turns, in part, on whether it "sufficiently duplicates the original event." Persley v. New Jersey Transit Bus Operations, 357 N.J.Super. 1, 14-15, 813 A.2d 1219, 1227-28 (App.Div.), certif. denied, 177 N.J. 490, 828 A.2d 918 (2003); see also Balian v. General Motors, 121 N.J.Super. 118, 126, 296 A.2d 317, 321 (App.Div.1972), certif. denied, 62 N.J. 195, 299 A.2d 729 (1973). Not only must such evidence be authenticated, N.J.R.E. 901, and relevant, N.J.R.E. 401, its probative value must not be offset by undue prejudice, unfair surprise, undue consumption of trial time, or possible confusion of issues due to the introduction of collateral matters. Balian, supra, 121 N.J.Super. at 127, 296 A.2d at 321-22; N.J.R.E. 403.
Thus, in Crispin v. Volkswagenwerk AG, 248 N.J.Super. 540, 556-57, 591 A.2d 966, 974-75 (App.Div.), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991), we rejected a video simulation of a high-speed rear-end automobile collision, finding there were too many variables between the tests and the evidence presented with respect to the motor vehicle accident to render them probative on any point raised. In Suanez v. *1010 Egeland, 330 N.J.Super. 190, 196, 749 A.2d 372, 375 (App.Div.2000), we rejected a similar videotape not only because of differences between the crash test depicted on the tape and the actual accident, but also because it had not been provided to the plaintiff in discovery; the judge failed to instruct the jury the tape was not substantive evidence; the tape was not properly authenticated by the bioengineer who merely assured that it was "internationally known;" and the accident on the video was shown only in extreme slow motion which gave the impression of less movement and thus less impact.
In Macaluso v. Pleskin, supra, we ruled that an animated video depicting the anatomy associated with various musculoskeletal injuries should not have been played for the jury because it was not used as a visual aid and it contained "speculation regarding the possible consequences of hypothetical injuries." 329 N.J.Super. at 353, 747 A.2d at 835. We found the video essentially "testimonial" in nature, and because the tape's contents were susceptible of being accepted by the jury as substantive evidence, we concluded a new trial was warranted. Ibid.
Also in Macaluso, the defendant objected to the use of computerized images of plaintiff's x-rays, taken by her treating chiropractor, solely on the grounds that the physician had not made the computerized images. In holding this evidence properly admissible, we relied on the fact that the treating physician took the x-rays, ordered the computerized images, and authenticated them by testifying that they were "a fair and accurate depiction of the x-rays he had taken." Id. at 356, 747 A.2d at 837.
In the present case, defendant's objection to the use of the computerized imagery of decedent's x-ray films goes far beyond the fact that plaintiff's testifying expert had neither created nor directed the presentation. In addition, defendant complains of surprise and the lack of notice, the failure to instruct the jury as to the limited purpose of the computerized images, the absence of a sufficient foundation to support their presentation to the jury, and the highly influential and testimonial nature of the evidence.
Plaintiff counters that the computer enlargement was not meant as substantive evidence, but only for demonstrative purposes, as a visual aid to assist the jury in understanding the radiologists' expert opinions and to explain the nature of the appearance of a malignancy in a mammogram. This distinction, however, was never made clear to the jury. The jurors were never instructed as to the limited purpose for which the computerized images were being shown. They were never told, for instance, that the computer images were only an aid to help understand the technical medical testimony as opposed to proof of what defendant actually observed. From the jury's point of view, the computer images were indistinguishable from any other evidence. Compounding this problem is the fact that the gross magnification of the mammography films had a tendency, according to defendant and his expert, to distort, rather than clarify, that which was actually viewed by defendant. More significant, given that the very essence of the malpractice claim was error in visual observation, the so-called "visual aid" took on testimonial significance, and its contents were highly susceptible of being perceived by the jury as substantive evidence. Indeed, rather than being apprised that the computer imagery was not intended to be the exact replication of every detail that could or should have been seen by defendant, the jury was repeatedly told by plaintiff's expert just the opposite, namely, that the computer *1011 magnification was an identical representation of the images apparent on the mammogram films when viewed under the standard magnifying glass.
Of course, the issue was not whether the calcification clusters could be viewed in a super-magnified computer image, but whether defendant deviated from the accepted standard of care when he concluded that which he viewed on the x-rays was not suspicious of cancer. In other words, computerized magnification was not the mechanism used by radiologists following the standard of care recognized in the medical community, which was, indisputably, to view the mammogram with a 2.5 power magnifying lens. However, the use of computerized images to demonstrate that a cancerous cluster existed on the mammogram films and was so "clearly visible" that it should have been detected by defendant had the clear potential to confuse the jurors and distract them from assessing defendant's action under the correct standard of care. The danger here was that the jury could assume that defendant should have used the computer technology being presented at trial, despite the absence of any evidence of a medical consensus that the images in a mammogram are accurate where the x-ray is scanned into a computer, blown up, and projected on a large screen. As such, the "demonstration" did more than simply illustrate expert testimony. It provided the jury with testimonial evidence  independent proof  of that which could and should have been seen by defendant using the standard hand-held magnifying glass used to interpret mammograms.
We cannot be certain what role this presentation actually played in the jury's evaluation, although the computer imagery was repeatedly displayed to the jury and was a substantial part of both the direct examination of plaintiff's expert and the cross-examination of defendant's expert. To be sure, during deliberations, the jury had the ability to view the mammogram films on a light box utilizing a traditional magnifying glass. But the very real danger persisted that the jurors could not erase from their minds the images being continually projected on the screen when they later returned to the jury room to consider the actual evidence. Suffice it to say, in the absence of a limiting instruction, such imagery is clearly capable of influencing a jury, of generating confusion over the appropriate standard of care, and thus, unduly prejudicing defendant, entitling him to a new trial wherein the concerns raised herein must be fully addressed before introduction of this type of evidence.
Heightening our concern is the lack of adequate notice afforded defense counsel of the use of this technology and the failure to lay a complete foundation for its introduction. See, e.q., Suanez v. Egeland, supra, 330 N.J.Super. at 193-96, 749 A.2d at 373-75; Balian v. General Motors, supra, 121 N.J.Super. at 126-29, 296 A.2d at 321-22. As to the latter, plaintiff's expert, a radiologist through whom the computer imagery was introduced, neither created nor directed either the underlying x-ray or the computer projection. Nor was he present when either was made. The medical expert offered no account of how the films were scanned into the computer, or how the computer program operated. Consequently, he added very little to explain the circumstances surrounding the computer images' creation and was not even aware of the actual level of magnification involved in the computer enlargement.
In our view, the use of a computer-generated exhibit requires a more detailed foundation than that for just photographs or photo enlargements. The latter "must be proved to be faithful representations *1012 of the subject at the time in question. Fundamentally, photographs are deemed to be pictorial communications of a qualified witness." State v. Smith, 27 N.J. 433, 448, 142 A.2d 890, 899 (1958). However, considering the reliability problems arising from computer-generated exhibits and the processes by which they are created, see State v. Swinton, 268 Conn. 781, 847 A.2d 921, 941-43 (2004), there must be "testimony by a person with some degree of computer expertise, who has sufficient knowledge to be examined and cross-examined about the functioning of the computer." American Oil Co. v. Valenti, 179 Conn. 349, 426 A.2d 305, 310 (1979). Mere visual inspection, as was done here by Dr. Berg, is simply not enough to ensure the reliability of the computer-generated exhibit. State v. Swinton, supra, 847 A.2d at 952 fn. 47. Rather, what is required is testimony from a witness who possesses sufficient knowledge of the technology used to create the exhibits. Ibid.; see also Nooner v. State, 322 Ark. 87, 907 S.W.2d 677 (1995), cert. denied, 517 U.S. 1143, 116 S.Ct. 1436, 134 L.Ed.2d 558 (1996); English v. State, 205 Ga.App. 599, 422 S.E.2d 924 (1992). This was not accomplished here.
We are also persuaded that the error in permitting the computer presentation was not harmless, even assuming the only issue in dispute is not what was actually seen on the x-rays, but its significance. Both experts appear to agree that a cluster of five or more differently shaped calcifications in less than one square centimeter and detected on both views is suspicious of cancer. They disagree, however, about whether the calcifications were visible on both views of the breast and whether the calcification cluster was "focal"  appearing in one part of one breast and, therefore, suspicious of cancer  or "diffused"  part of a general phenomenon of multiple calcifications throughout the patient's breasts, due to her preexisting condition of bilateral fibrocystic disease. Here again, the capacity of computer projection to mislead was very real because it may have created the appearance of a "focal" cluster, rather than part of a small sample of a general phenomenon, by showing only a selective image instead of an all-inclusive picture. Moreover, as to whether the two views were the same  a requisite for finding a suspicion of cancer  the computer projection could have created the appearance that the clusters were in the same locations by compressing the image, especially in light of defendant's expert's opinion that the cluster shown in the CC projection did not correspond with that shown in the MCO projection because the cluster in the former was far deeper in the breast. Whether or not any such manipulation occurred is, of course, not the point. That the computer-generated images were not the medically accepted diagnostic tool very much is the point. Under these circumstances, we are convinced the error was not harmless.
Because the computer imagery displayed to the jury was unduly influential, potentially confusing, susceptible of being accepted as substantive evidence, and clearly capable of producing an unjust result, we reverse and remand. In light of our disposition of the principal issue and the remand for a new trial, we need not decide defendants' remaining arguments. Because of the possibility of a recurrence, however, we are constrained to briefly comment on certain remarks by plaintiff's counsel in his summation.
During summation, plaintiff's counsel suggested that defendant missed the evidence of cancer because he cared more about "making money" and living "the good life," spending only thirty-six seconds looking at each mammogram *1013 film  a number determined based on the hours defendant presumably worked in a week and the number of mammograms he reviewed each year. Counsel continued by disparaging defendant's expert, who, he maintained, argued "a little bit more like a lawyer than a doctor" and was "a professional witness" who "adjust[s] his testimony for every case." He went on to inform the jury that the defense failed to produce a journal article supporting its position and stated "do you think that a doctor with his lawyer and their resources wouldn't produce that article to you if it existed?" These comments remained uncorrected by the trial judge.
Although attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness, Henker v. Preybylowski, 216 N.J.Super. 513, 518-19, 524 A.2d 455, 458-59 (App.Div.1987); Geler v. Akawie, 358 N.J.Super. 437, 470-71, 818 A.2d 402, 423-24 (App.Div.), certif. denied, 177 N.J. 223, 827 A.2d 290 (2003), or accuse a party's attorney of wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury, or of deliberately distorting the evidence. See Henker v. Preybylowski, supra, 216 N.J.Super. at 518-19, 524 A.2d at 458-59.
Here, counsel's comments in summation were unduly harsh and amounted to an attack on defendant's character and his witness's integrity. They occupy no rightful place in proper commentary on the evidence and the credibility of testimony. They are not to be repeated on retrial.
Reversed and remanded for a new trial.